68 So.2d 889 (1953)
BECK et al.
v.
LITTLEFIELD et al.
Supreme Court of Florida. Special Division A.
December 15, 1953.
*890 Cobb & Cole, and Leon F. Stewart, Daytona Beach, for appellants.
Horn & Ossinsky and Alex D. Littlefield, Jr., Daytona Beach, for appellees.
THOMAS, Justice.
The appellants, described in their bill as citizens and residents of Holly Hill, brought suit on behalf of the city and its citizens and taxpayers against Alex D. Littlefield and Bernard M. Beach and their wives, seeking a decree declaring the rights and duties of the respective parties with reference to a parcel of land in the city lying between Dixie Highway, otherwise now known as Riverside Drive, and the Halifax River. They sought also an adjudication that the title to all land east of the street was held by the appellees in trust for the city. They asked the court to "determine the course of the high water line * * * at the time of the recording of the plat entitled `Shore Acres, Riverside Addition'" in 1926 and to confirm in the city the title to all riparian rights where the "right of way borders upon the Halifax River."
It appears from the pleading that the property in question, between the east line of the right-of-way and the river, is of varying width and that in many places the high water mark is west of the original east line of the right-of-way.
For many years, according to the allegations of the pleadings, "successive city administrations * * * have declared it to be the intention of the City * * * to make a riverfront park out of all land lying easterly of said * * * Drive" and north of a certain street. This assertion is lacking in force because the manner of declaration is not set forth and evidently this want is attempted to be supplied by the averment that an ordinance was passed in 1936 prohibiting erection of any buildings on the land. This action is construed by appellants as an expression by the city that the property east of the street should never be improved so the view of residents west of the street would be obstructed. Not only is such an interpretation strained but it completely ignores the lack of power in a city to ordain that an owner may not erect any building on his property, Clearly, such an attempt would run afoul of the guaranty of due process. This is so patent that we make the observation at the risk of being charged with indulging in obiter dicta for the constitutionality of the ordinance is not raised. Miami Shores Village v. State ex rel. Ellis, Fla., 53 So.2d 324.
The appellants represented that, relying on the intention of the city to make the lands into a park and relying on the ordinance, they purchased their properties situated west of the drive and improved them at considerably more cost than would have been the case "had they anticipated that the defendants would claim title to all of said riverfront lands." It is charged that the defendants planned to fill between the upland and the channel and subdivide the area "for the erection of homes" which would result in obstructing appellants' view and interfering with their "right to the pleasant breezes that they now enjoy from the river."
We will now analyze that part of the bill giving a history of the title to the street and the land east of it. The original subdividers owned a tract bounded by the river on the east. When they platted it as a subdivision in 1922, the plat showed at the east side of the easterly lots a strip of land fifty feet in width marked "Dixie Highway" and east of that a twenty-foot *891 strip designated "Reserved". The plat contained no dedication and it cannot be ascertained from it that the east line of the area marked "Reserved" coincided with the high water mark of the river, although it does appear that at one place there was a sizeable triangular parcel jutting into the water.
Further, to complicate the facts, it appears from the bill that the subdividers, in 1926, revised that part of the plat of 1922 which showed the Dixie Highway and the land to the east. On the later plat the highway was widened to one hundred feet, the twenty-foot reserved strip was eliminated and eleven lots three hundred feet in depth, with a total frontage of about eleven hundred and fifty feet, bordered on the west by the east line of Dixie Highway, were shown. This at once is puzzling because from the first map it is not clear that there was any appreciable amount of land east of the highway except the triangular parcel to which we have already referred, but the situation is clarified by reference to the minutes of the town council of 27 June, 1928. Even though the plat of the resubdivision had been recorded, one of the subdividers appeared before the city council, exhibited the plat of the "lands * * * owned by her lying between the Dixie Highway and the Halifax River, and certain submerged lands in the Halifax River adjoining the same, the plat representing the property after the submerged lands shall have been filled in. She also advised the * * * Council that she proposed to secure a deed of conveyance to the submerged lands covered by the plat. After consideration of these matters a motion was duly made * * * [and] seconded * * * that the said plat be approved * * * and that the Town * * * consents to [the subdivider] securing a deed of conveyance to such submerged lands from * * * the Trustees of the Internal Improvement Fund * * *." The motion carried. We have quoted from the minutes.
The next year the Trustees of the Internal Improvement Fund, pursuant to Chapter 7304, Laws of Florida, Acts of 1917, F.S.A. §§ 253.12 to 253.15, conveyed to the subdividers the river bottom in front of the lands described in the plat. Parenthetically, the pleaders challenged the authority of the trustees to issue the deed because the lands were not of the character described in the law but patently this was a matter which could be determined only by evidence of the nature of the land at the time of the deed and no such evidence was introduced.
Inasmuch as all parties to the suit asked for a summary decree, the controversy was decided on documentary evidence which had no bearing on this point; and no one here objects to the procedure that was followed. We do not feel obliged further to explore this phase of the dispute.
Several years passed and the council took action the appellants allege was intended to restrict the use of the property and to discourage the "private ownership thereof, so that the same could eventually be made into a city park * * *." Evidently this averment refers to the ordinance we have mentioned placing "All territory between the Halifax River and the East Side of Beach Street" which we understand to be the same as Riverside Drive and Dixie Highway, in a district known as "Residence `B'". The ordinance further provided that "No buildings of any kind shall be erected in this [Residence B] district."
Eventually title to the property in question vested in the State because of nonpayment of taxes. The appellees made application to purchase it and the Trustees conveyed it to them in 1940. In 1947 they obtained quitclaim deeds from the former owners of the record title.
It appears that the appellee-husbands executed in 1951 a "TEMPORARY SPOIL DISPOSAL EASEMENT GRANT" to the United States of America so that, we presume, the spoil from dredging in the river would be deposited adjacent to their upland and enlarge its area.
It is charged in the bill that the appellees, Alex D. Littlefield and Bernard M. *892 Beach, were councilmen at the time the zoning ordinance was passed and when they purchased the property from the Trustees of the Internal Improvement Fund. Much more significance is attached by appellants to this situation than we think it deserves. The appellants urged the chancellor to hold that appellees' purchase while they served as councilmen made them trustees because they, in effect, dealt for the city.
The chancellor entered a summary decree for the appellees. Upon appeal from that decision we undertake to dispose of the questions posed by the appellants. He held, point-blank, that appellants' motion for summary decree should be denied, appellees' granted; that fee simple title to the property was vested in appellees and that they did not hold the property in trust for anyone.
The first of these questions we need not answer because by it the appellants merely wish to know whether they may "bring an action to prevent * * * public property [the land in controversy east of the street] from being put to an unlawful use, which will depreciate the value of the plaintiff's property?" The appellants did bring the suit and did secure a ruling on the merits pursuant to their motion, as well as appellees, so to dispose of the case.
The second question grows out of the last clause of the adjudication by the chancellor. We quote it fully: "Where the mayor and a city councilman participate in the passage of a city ordinance forbidding the erection of buildings on certain land; which ordinance contemplates the establishment of a public park on said land, and said mayor and city councilman then buy said land for taxes for the avowed purpose of building thereon, do said mayor and councilman hold said property in trust for the city?"
We have discovered nothing in this record to justify the premise we have italicized. Nothing whatever appears in the ordinance cited to, and by, us even to indicate that by prohibiting the construction of buildings in the territory the city proposed to acquire the property for park purposes or to establish a park upon it. No steps were ever taken to that end. A municipal corporation speaks only through its records, not through opinions of individual officers. City of Evarts v. Fuller, 261 Ky. 47, 86 S.W.2d 1058. See Sec. 27, Chapter 21297, Laws of Florida, Special Acts of 1941 (Charter of City of Holly Hill).
Stripped of the language italicized, the question leaves little for answer but we will not pass to the next one without making a few observations that seem to us pertinent. It will be remembered that almost eight years before the enactment of the ordinance one of the subdividers submitted to the city council a plat including the property east of the street, some of it submerged, apprised the council precisely what she proposed to do, that is, obtain a deed from the Trustees for the adjacent land under water, and secured the council's blessing on her efforts. Certainly the council indicated at that time no purpose to procure the property for the city. About eight years passed before enactment of the ordinance, which we cannot construe to have announced such intention on the part of the municipality, hence, to repeat, we attach no importance to Littlefield's and Beach's positions in the government. Moreover, the taxes on the property had meanwhile become delinquent and then under the "Murphy Act", Chapter 18296, Laws of Florida, Acts of 1937, F.S.A. §§ 192.35 to 192.38, 192.35 note, title became vested in the State. We are aware of no attempt on the part of the city to secure the property as appellees eventually did by applying for it and bidding it in at a public sale after duly advertised notice.
Another seven years elapsed and the appellees "perfected their title", to use the language of appellants' brief, by getting quitclaim deeds from the persons who owned the property at the time taxes on it became delinquent.
What we have just written bears upon the matter of laches but we have not *893 set it down for that purpose. We recount what occurred with reference to the dealings with the property over a span of many years because it emphasizes the weakness of the position now taken about an intention on the part of the city somehow to constitute it a park.
Once this question topples because of the unsound premise, there is no occasion to indulge in a discussion of the principle that persons in a fiduciary position may not take advantage of their situation by acting to their own profit, but will be held responsible as trustees. We are familiar with the authorities, at least one of which we wrote, cited to us by appellants but we cannot bring these cases into play for the simple reason that the intention to create a public park of the property in question has not been established.
It is our view that the intention of a municipal corporation may not be shown by the attitude or statements of a minority of the councilmen, and we are strengthened in this view when we consider the long period of time that passed during which no effort was made, so far as we are informed, to secure the land for the city, a relatively simple procedure, or to declare officially an intention to obtain the property, a still simpler procedure. We do not know that the councilmen even discussed the matter among themselves. On the contrary, the council at the outset sanctioned the subdivision and the proposed purchase by the subdividers of the submerged land, and there is nothing in the record to demonstrate that the attitude of the city then expressed was ever changed. The city is not now complaining and so far as this record shows has not complained of the situation which so aggrieves the appellants. For twenty-five years the appellants and those in like situation have been on constructive notice that the land in question was privately owned except when the State held title because of delinquent taxes and even then it was available to them as well as appellees.
By their third question appellants ask the Court whether the appellees in the circumstances already related became estopped to assert title to the property involved in this litigation. What we have already written disposes of this point contrary to their contention.
Appellants next pose the question of the claim of the city to the riparian rights incident to those parts of the dedicated street that are lapped by the waters of Halifax River. How many such places there are and their dimensions we do not know, it being merely represented in the bill that "the high water mark in said area, for much of the length of said area, is westerly of the east right of way boundary of Riverside Drive." Even though there was no testimony from which could be determined whether and to what extent the waters of the river touched the boundary of the street we will briefly answer the question. As we have seen, the case was decided after appellees on the one hand and appellants on the other asked for summary decrees so all litigants were committed to the view that the Court had sufficient information to determine the issues.
So firm is our conviction that the assertion of the appellants is completely refuted by the record itself that we will not pause to consider the technicality of properly presenting by testimony the physical characteristics of the property. For emphasis, the dedication itself, the plat that contains it and the sanction of the city belie the thought that there was any intention whatever on the part of the dedicators to surrender any riparian rights. The plat showed the strip to be used as a street and showed lots between that street and the water. The council approved the plat knowing the dedicators proposed to buy from the State. It is obvious that one does not mean to dedicate riparian rights when lots are shown on the dedicatory plat between the dedicated street and the water. See City of Tarpon Springs v. Smith, 81 Fla. 479, 88 So. 613.
The last question we are not inclined to answer because it is another challenge of the authority of the Trustees *894 of the Internal Improvement Fund to convey the submerged property. Here again the question is based on facts, that is, the physical characteristics of the property at the time of the original conveyance, when no such facts were attempted to be proved.
We conclude that the chancellor was eminently correct when he entered the decree we have already described.
Affirmed.
ROBERTS, C.J., and SEBRING and MATHEWS, JJ., concur.